**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **JUSTIN D'AMATO,** | **CASE NO. 1:18-CV-00680** |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **OFFICER JOHN KAZIMER, et al.,** | |
| **Defendants.** | **MEMORANDUM OF OPINION AND ORDER** |

This matter comes before the Court upon the Motion for Summary Judgment of Defendants Officer John Kazimer ("Officer Kazimer") and the City of Cleveland (the "City") (collectively, "Defendants"). (Doc. No. 35.) On August 9, 2019, Plaintiff Justin D'Amato ("D'Amato") filed separate briefs in opposition to Defendants' Motion for Summary Judgment to respond to the arguments made on behalf of Officer Kazimer and the City, respectively. (Doc. Nos. 41, 42.) Defendants replied on August 23, 2019. (Doc. No. 43.) For the following reasons, Defendants' Motion for Summary Judgment (Doc. No. 35) is GRANTED as to D'Amato's first and fifth causes of action brought under 42 U.S.C. § 1983. The remaining state law claims are DISMISSED WITHOUT PREJUDICE.

**I. Background**

**a. Factual Background**

In the early morning hours of August 11, 2015, Officer Kazimer and his partner, Officer Robert Ortiz ("Officer Ortiz"), were patrolling the West Park area of the City of Cleveland. (Doc. No. 35-1 at 11:2-10.) According to Officer Kazimer, while driving eastbound on Puritas Avenue, Officer Ortiz called Officer Kazimer's attention to a vehicle that had just run a red light while making

a left turn onto Puritas Avenue four or five blocks in front of the officers' vehicle. (*Id.* at 14:10-21, 15:6-20, 21:22-22:13.) Officer Kazimer asserts that they started to follow the vehicle and he observed the vehicle swerving, driving sporadically at a high rate of speed, blaring music, and driving on what sounded like a flat tire. (*Id.* at 14:19-21, 16:16-17:3, 23:19-22, 24:20-25:6, 26:25-27:4.) When the vehicle stopped at a red light, Officer Kazimer claims that they pulled up to the vehicle's blind spot and he noticed fresh bullet holes in the side of the car. (*Id.* at 23:6-18, 23:23-24:4, 25:7-13, 40:4-14.) Based on these observations, Officer Kazimer told Officer Ortiz to pull the vehicle over. (*Id.* at 26:13-24).[1]

Subsequently, the officers activated the overhead lights and sirens, and the driver of the vehicle immediately pulled over. (*Id.* at 30:20-31:4.) Officer Kazimer then exited the police cruiser and approached the vehicle on the passenger side. (*Id.* at 42:9-12.) As Officer Kazimer approached the vehicle on the passenger side, Officer Ortiz also exited the police cruiser and approached on the driver side of the vehicle. Officer Ortiz activated his body camera shortly before they pulled the vehicle over, and both parties submitted the footage from Officer Ortiz's body camera as an exhibit. (Doc. No. 35-2; Doc. No. 41-2.)[2]

When Officer Kazimer reached the passenger side window of the front seat of the vehicle, he observed the driver, later identified as D'Amato, with a black handgun in his waistband. (Doc. No. 35-1 at 43:1-4.) After seeing the gun, Officer Kazimer drew his service weapon and ordered D'Amato

---

[1] Officer Ortiz's account of the reason for the stop differs slightly from that of Officer Kazimer's, as Officer Ortiz testified at his deposition that they stopped the vehicle because it was driving recklessly and without any lights on. (Doc. No. 41-1 at 12:16-17, 13:3-6, 14:1-5, 15:1-5.) Officer Ortiz did not recall observing bullet holes in the vehicle. (*Id.* at 17:13-15.) Nonetheless, D'Amato concedes that the officers had probable cause to stop his vehicle. (Doc. No. 42 at 4 n.1.)

[2] Officer Kazimer believed that he also had activated his body camera as soon as he exited the police cruiser, but it did not actually turn on. (Doc. No. 35-1 at 42:11-12.) As such, the only footage of the use of force at issue is from Officer Ortiz's body camera. Officer Kazimer did turn on his body camera after D'Amato's shooting, however, and D'Amato also submitted that footage as an exhibit to his opposition. (Doc. No. 41-2.)

2

not to move. (*Id.* at 43:20-23, 44:12-14.) At first, D'Amato did not react, so Officer Kazimer yelled "don't move" again. (*Id.* at 44:12-17.) After that, D'Amato slowly turned his head and, as soon as he saw Officer Kazimer, pulled his shirt over the gun. (*Id.*) Officer Kazimer then alerted Officer Ortiz to the fact that D'Amato was armed. (*Id.* at 51:18-19.)

Footage from Officer Ortiz's body camera shows that as Officer Ortiz approached the vehicle, Officer Kazimer yelled at D'Amato to drop the gun and not to move. Officer Ortiz then ordered D'Amato to get out of the car. (Doc. No. 41-1 at 18:2-3.) D'Amato complied with this order and exited the car. (*Id.* at 18:6-9.) According to Officer Kazimer, at this point, D'Amato "opened the door . . . his hands are up, he's obeying commands." (Doc. No. 35-1 at 51:24-25.) Almost immediately upon exiting the vehicle, however, D'Amato started to run.

The parties' accounts of what happened next are inconsistent in several respects. At his deposition, Officer Kazimer testified that D'Amato ran around the front of the car, curving towards Officer Kazimer to go down a side street. (*Id.* at 51:18-52:7.) Officer Kazimer claims that as D'Amato came around the front of the car, Officer Kazimer observed D'Amato's hands going for his waistband where Officer Kazimer had just seen D'Amato's gun. (*Id.* at 56:19-57:3.) As a result, Officer Kazimer testified that he felt an immediate threat to his life and fired his gun twice. (*Id.* at 56:23-57:3, 61:7-9.) Officer Kazimer asserts these first two shots did not have any effect, so he then fired two more shots, after which D'Amato fell to the ground. (*Id.* at 61:9-10.) As D'Amato fell after being shot, his gun and a gun magazine dropped out of his waistband to the ground. Officer Kazimer claims that after D'Amato had fallen to the ground, he saw D'Amato make a movement towards the gun, which was only two or three feet away. (*Id.* at 69:16-70:6.) Specifically, Officer Kazimer testified he "thought [D'Amato] was reaching for the gun with his left arm. It later shows

3

that it was his left leg, but he was getting up on the side towards the gun. The gun was only two, three feet away. So there was still a threat." (*Id.* at 70:2-6.) Officer Kazimer claims he fired his fifth shot at D'Amato in response to this movement, at which point D'Amato stopped and rolled over. (*Id.* at 63:11-23, 69:16-24, 70:13-71:7.) At this point, Officer Kazimer testified that he and Officer Ortiz were able to get control of the scene and start first aid. (*Id.* at 69:16-20.)

D'Amato disputes this description of events. D'Amato asserts that Officer Ortiz's body-camera footage shows that D'Amato is running towards the side street, but also that he is clearly fleeing and running away from both officers, not curving towards Officer Kazimer. (Doc. No. 41 at 4.) D'Amato also testified at his deposition that while running from the officers, he did not reach for his gun. (Doc. No. 35-3 at 36:24-37:1, 38:3-10.) D'Amato contends his testimony is supported by Officer Ortiz's body-camera footage—which he asserts shows he did not reach for his gun when Officer Kazimer began shooting (Doc. No. 41 at 5)—and Officer Ortiz's deposition testimony stating that he never saw D'Amato reach for his gun (Doc. No. 41-1 at 26:6-17). Finally, D'Amato asserts the body-camera video reveals that neither D'Amato's leg, nor any other appendage, ever moved toward his gun after he fell to the ground. (Doc. No. 41 at 10, 13-14.) Instead, D'Amato claims the video shows him in a squatting position, and that he makes what appears to be an involuntary motion away from, not towards, his gun prior to the fifth shot by Officer Kazimer. (*Id.* at 9-10.) He also argues that the magazine of the gun appears to be about three feet away from him after he fell, but that the actual gun is approximately five feet from D'Amato. (*Id.* at 10.)

Although unknown to Officer Kazimer and Officer Ortiz at the time, when they encountered D'Amato, he had just committed a series of violent crimes and the vehicle he was driving had just been stolen in an armed robbery. As a result of the events leading up to and including his arrest,

4

D'Amato was indicted for multiple offenses, including aggravated robbery, kidnapping, theft, felonious assault, resisting arrest, having weapons under disability, and drug possession. (Doc. No. 35-4.) D'Amato subsequently pled guilty to multiple counts of the indictment, including Count 8 for resisting arrest. (Doc. No. 35-5.) Specifically, Plaintiff pled guilty to resisting arrest while brandishing a deadly weapon pursuant to Ohio Revised Code § 2921.33(C)(2). (*Id.*)[3]

### b. Procedural History

On March 26, 2018, D'Amato filed the current Complaint against Defendants. (Doc. No. 1.) In his Complaint, D'Amato sets forth claims under 42 U.S.C. § 1983 against Officer Kazimer for the use of excessive force in violation of the Fourth Amendment and against the City for failing to adequately supervise its officers, train its officers on the use of appropriate levels of force, and investigate its officers' use of excessive force. (*Id.* at ¶¶ 47-51, 60-65.) D'Amato also brings claims under Ohio law against Officer Kazimer for assault, battery, and intentional infliction of emotional distress and against the City for negligent hiring, training, and supervision. (*Id.* at ¶¶ 52-59.)

On May 31, 2019, Defendants filed a Motion for Summary Judgment as to all of D'Amato's claims. (Doc. No. 35.) On August 9, 2019, D'Amato filed separate briefs in opposition to Defendants' Motion for Summary Judgment to respond to the arguments made on behalf of Officer Kazimer and the City, respectively. (Doc. Nos. 41, 42.) Defendants filed a joint reply on August 23, 2019. (Doc. No. 43.) As such, Defendants' Motion is ripe for consideration.

---

[3] In Ohio, brandishing is defined as "to wave or exhibit in a menacing or challenging manner." *State v. McCrary*, No. C-080860, 2009 WL 2674327, at *4 (Ohio Ct. App. 1st Dist. Aug. 28, 2009) (citation omitted).

5

**II.     Standard of Review**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*,

6

593 F. App'x at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

### III. Analysis

#### a. Excessive Force

Defendants argue that D'Amato's excessive force claim under 42 U.S.C. § 1983 is barred by the doctrine set forth by the Supreme Court in *Heck v. Humphrey*, 512 U.S. 477 (1994). (Doc. No. 35 at 5-7.) Defendants assert that pursuant to *Heck* and the Sixth Circuit's interpretation of that decision, D'Amato's claim for excessive force is barred by his guilty plea to resisting arrest. (*Id.*) Alternatively, Defendants argue that even if D'Amato's claim is not barred, Officer Kazimer is entitled to qualified immunity. (*Id.* at 8-11.) In response, D'Amato contends that his claim is not barred by *Heck* because a close examination of the temporal sequence of events demonstrates that a judgment in his favor on his excessive force claim would not necessarily imply the invalidity of his conviction, and that Officer Kazimer is not entitled to qualified immunity. (Doc. No. 42.) The Court concludes that the *Heck* doctrine bars D'Amato's claim, and the Court thus need not address the issue of qualified immunity.

"In *Heck*, the Supreme Court held that a plaintiff cannot assert a § 1983 claim if success on that claim would 'necessarily imply the invalidity' of an underlying state criminal conviction, unless the plaintiff can 'prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.'" *Hayward v. Cleveland*

*Clinic Found.*, 759 F.3d 601, 608 (6th Cir. 2014) (quoting *Heck*, 512 U.S. at 486-87.) Conversely, "if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Heck*, 512 U.S. at 487.

In the Sixth Circuit, "there are two circumstances under which *Heck* may apply to bar a § 1983 claim." *Hayward*, 759 F.3d at 608. "The first is when the criminal provision makes the lack of excessive force an element of the crime." *Schreiber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010). "The second is when excessive force is an affirmative defense to the crime." *Id.* Under either circumstance, "the § 1983 suit seeks a determination of a fact that, if true, would have precluded the conviction." *Id.*

Under Ohio law, "a *lawful* arrest is a necessary element of a conviction for resisting arrest." *Swiecicki v. Delgado*, 463 F.3d 489, 494 (6th Cir. 2006), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384 (2007).[4] The Sixth Circuit has suggested that a lawful arrest cannot occur if the arresting officer has used excessive force. *White v. Ebie*, No. 98-3958, 1999 WL 775914, at *1 (6th Cir. Sept. 24, 1999) ("An arrest is not lawful, under Ohio law, if the arresting officer used excessive force.").[5] Accordingly, in certain circumstances, courts have found that an excessive force claim "attack[s] an essential element of the resisting arrest offense, i.e., the lawfulness of the arrest," and is thus barred by *Heck*. *Id.* at *1; *see also Swiecicki*, 463 F.3d at 494.

---

[4] Ohio's resisting arrest statute to which D'Amato pled guilty provides that "[n]o person, recklessly or by force, shall resist or interfere with a *lawful arrest* of the person or another person if . . . [t]he offender, during the course of the resistance or interference, brandishes a deadly weapon." Ohio Rev. Code § 2921.33(C) (emphasis added).

[5] In *Hayward*, the Sixth Circuit noted that some Ohio appellate courts have not adopted this interpretation of a lawful arrest. 759 F.3d at 609-11. This potential conflict, however, is irrelevant to the Court's decision, which is based on the fact that pre-arrest excessive force is an affirmative defense to a charge of resisting arrest in Ohio, as discussed below.

8

In addition, Ohio courts have held that an officer's use of excessive is an affirmative defense that a criminal defendant may raise in response to a charge of resisting arrest. *E.g.*, *Mansfield v. Studer*, Nos. 2011–CA–93, 2011–CA–94, 2012 WL 4955278, at *15 (Ohio Ct. App. 5th Dist. Oct. 17, 2012) ("[E]xcessive force is an affirmative defense to resisting arrest."). Specifically, the Sixth Circuit has determined that "*pre-arrest* excessive force is an affirmative defense to a charge of resisting arrest in Ohio." *Hayward*, 759 F.3d at 613 (emphasis added). "Therefore, a criminal conviction for resisting arrest in Ohio cannot stand where a criminal defendant successfully asserts the affirmative defense of pre-arrest excessive force; and a § 1983 claim of excessive force would necessarily imply the invalidity of an underlying conviction for resisting arrest." *Id.* at 611. On the other hand, "*Heck* does not bar § 1983 suits alleging *post-arrest* excessive force." *Id.* Applying this analysis, in *Hayward*, the Sixth Circuit affirmed the district court's dismissal of the plaintiff's excessive force claim because "the alleged excessive force occurred in response to Plaintiff's resistance and before an arrest was effectuated." *Id.* at 613.

Likewise, here, the alleged use of excessive force by Officer Kazimer occurred in response to D'Amato's resistance and before an arrest was effectuated. In this case, almost immediately upon exiting his car, D'Amato began to run from the officers. Officer Kazimer then fired at D'Amato in response to D'Amato's resistance and in order to procure his arrest. All of the shots fired by Officer Kazimer occurred within approximately six seconds, and D'Amato was clearly attempting to flee when Officer Kazimer fired the first four shots that brought D'Amato to the ground. In addition, with regard to the fifth shot, it is undisputed that D'Amato was still in a squatting position and continuing to move—even if involuntarily as postulated by D'Amato (Doc. No. 41 at 9-10)—seconds before Officer Kazimer fired for the fifth time. It is only after this final shot that Officer Kazimer testified

9

that D'Amato stopped, and he and Officer Ortiz were able to get control of the scene. (Doc. No. 35-1 at 69:16-20.) As such, the Court finds that this case presents "a single factual context" in which Officer Kazimer's use of force was responsive to D'Amato's acts of resistance and occurred before his arrest. *See Hayward*, 759 F.3d at 612 n.4. Because pre-arrest excessive force is an affirmative defense to a charge of resisting arrest in Ohio, D'Amato's success on his excessive force claim would render his conviction for resisting arrest invalid. Therefore, D'Amato's claim is barred by *Heck*.[6]

Additionally, the Court finds D'Amato's reliance on *Phillips v. Curtis*, 765 F. App'x 130 (6th Cir. 2019) unpersuasive. (Doc. No. 42 at 14-15.) In *Phillips*, the defendants argued that the plaintiff's excessive force claim was barred by her guilty plea to wantonly endangering an officer. 765 F. App'x at 131. The Sixth Circuit held that the district court had been premature in its dismissal of the plaintiff's claim at the motion to dismiss stage, reasoning:

> In this case, Phillips purports to identify two separate incidents, one when she endangered Curtis, the other when he opened fire. To be sure, if the two incidents happened at roughly the same time—or in legitimate response to one another—*Heck* would bar her lawsuit. For placing Curtis in substantial danger of serious death or injury would mean that, at that moment, Curtis could use deadly force. *See Garner*, 471 U.S. at 11, 105 S.Ct. 1694. But Phillips says that she placed Curtis's life in jeopardy at point one, she ceased to be a threat at point two, and only after that did Curtis shoot her. Under that scenario, assuming a material gap in time between the two events, her victory in this lawsuit would not necessarily invalidate her criminal conviction.

---

[6] The Court acknowledges that there appears to be some support for the argument that a claim is not barred by *Heck* where the suspect resisted before the alleged use of excessive force—as D'Amato did here by running before he was shot—even if the force occurred before the completion of the arrest. *See Swiecicki*, 463 F.3d at 494-95 ("If Swiecicki resisted (*i.e.*, jerked his arm away), and if the resistance occurred *before* the use of force by Delgado, his conviction for resisting arrest would not be called into question even if he later recovered on a § 1983 excessive-force claim."); *Sigley v. Kuhn*, Nos. 98-3977, 99-3531, 2000 WL 145187, at *1, *4 (6th Cir. Jan. 31, 2000) (permitting excessive force claim when "Kuhn made a lawful attempt to arrest Sigley for drunk driving," "Sigley unlawfully resisted," and Kuhn shot Sigley in the back as he fled). Nonetheless, the Sixth Circuit has made clear that it "has only gone as far as to allow a § 1983 claim for excessive force where the alleged force occurred *after* the resistance and the completion of the arrest," *Hayward*, 759 F.3d at 612 n.4, and this Court is bound by that decision.

10

*Id.* at 132.

*Phillips* is easily distinguishable from the circumstances presented here. First, the court was assessing the application of *Heck* with regard to a prior conviction for wantonly endangering an officer—not resisting arrest. Thus, D'Amato's attempt to analogize to *Phillips* with respect to when he ceased to be a threat is irrelevant. (Doc. No. 42 at 15.) Under *Hayward*, the relevant inquiry in this case is not whether the force was used after the suspect ceased to be a threat to the officer, but whether the force was used before or after the suspect had ceased resisting and the completion of the arrest. Further, regardless of the different underlying offenses, *Phillips* recognized that the plaintiff's claim may not have been barred only if there was "a material gap in time between the two events." 765 F. App'x at 132. Here, there was no material gap in time between Officer Kazimer's use of force and D'Amato's resistance, as the two occurred at the same time and the entire incident lasted only seconds.[7] Accordingly, *Heck* bars D'Amato's § 1983 excessive force claim, and Officer Kazimer is entitled to summary judgment.

    **b.** *Monell* **Liability**

Defendants also move for summary judgment with respect to D'Amato's § 1983 claim against the City. (Doc. No. 35 at 13-20.) In his Complaint, D'Amato alleges that the City engaged in a variety of wrongful conduct with respect to the training, supervision, and investigation of its officers. (Doc. No. 1 at ¶¶ 58-65.) In his opposition to Defendant's Motion for Summary Judgment, however, D'Amato alleges only that the City "has an official custom, policy and/or practice of investigating

---

[7] Although not cited by D'Amato, the simultaneous nature of Officer Kazimer's use of force and D'Amato's resistance also distinguishes this case from *Lucier v. City of Ecorse*, which was cited in *Phillips* and which involved two separate incidents, one occurring in the suspect's basement and one occurring later in time after the suspect had been placed in a patrol car. 601 F. App'x 372, 377 (6th Cir. 2015).

11

police misconduct, specifically excessive force, in such a manner that City of Cleveland officers are absolved of any wrongdoing." (Doc. No. 41 at 14.) Defendants assert summary judgment is warranted because D'Amato's § 1983 claim against Officer Kazimer is barred by *Heck*—and therefore the City cannot be held liable in the absence of a constitutional violation—and because D'Amato has failed to present sufficient evidence to support his claim against the City. (Doc. No. 35 at 13-20.) The Court agrees with the City on both bases.

First, "[r]egarding municipal liability under § 1983, the Supreme Court has held that if the officer inflicted no constitutional injury on a person, then it is 'inconceivable' that the city could be liable to the person." *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 429 (6th Cir. 2006) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Because the *Heck* doctrine precludes D'Amato from establishing a constitutional violation by Officer Kazimer, his municipal liability claim also fails. *See Badri v. City of Shaker Heights, Ohio*, No. 1:06CV2343, 2007 WL 184735, at *3 (N.D. Ohio Jan. 19, 2007) ("As Dr. Badri's claims are barred by the doctrine established in *Heck*, he cannot prove a violation of a constitutional right in his claim of municipal liability under 42 U.S.C. § 1983."). As such, the City is entitled to summary judgment on D'Amato's § 1983 claim.

Moreover, even assuming D'Amato could prove a constitutional violation by Officer Kazimer, he has failed to present sufficient evidence in support of his claim against the City. Pursuant to the Supreme Court's holding in *Monell v. Dep't of Soc. Services of City of New York*, a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." 436 U.S. 658, 694 (1978). Instead, "municipal liability attaches only where a constitutional violation results from the 'execution of a government's policy or custom.'" *Cherrington v. Skeeter*, 344 F.3d 631, 645 (6th Cir. 2003) (quoting *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000)).

A plaintiff may prove the existence of a municipality's illegal policy or custom by looking to "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). "A necessary factor in all of these considerations is that, for a *Monell* claim to be viable, the municipal action (or inaction) must have been the moving force behind the constitutional harm." *France v. Lucas*, No. 1:07CV3519, 2012 WL 5207555, at *10 (N.D. Ohio Oct. 22, 2012); *see also Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) ("[L]iability will attach only where the plaintiff establishes that the municipality engaged in a 'policy or custom' that was the 'moving force' behind the deprivation of the plaintiff's rights.").

Here, there is simply not enough evidence to support a finding of *Monell* liability against the City. In Defendants' Motion for Summary Judgment, Defendants presented evidence of the City's policies and procedures with respect to its training, supervision, and investigations into police misconduct. (Doc. No. 35 at 17-21.) D'Amato has not challenged any of these policies or procedures as inadequate.

Instead, in support of his claim against the City, D'Amato references a December 2014 report by the U.S. Department of Justice ("DOJ") regarding an investigation into Cleveland Police Department practices and a related consent decree entered into between the City and the DOJ. (Doc. No. 41 at 15.) However, D'Amato has not actually submitted either document to the Court or cited any specific findings that would support his claim. Moreover, courts have generally refused to permit plaintiffs to rely on such evidence. *See Warren v. Tankersley*, No. 1:14–CV–1006, 2015 WL 5567103, at *4 (N.D. Ohio Sept. 21, 2015) ("Plaintiff asks this Court to adopt the results of a recent

13

investigation conducted by the Department of Justice ('DOJ') into the Cleveland Police Department practices as evidence to support his *Monell* claim in this matter. . . . Plaintiff provides no legal support for such argument, and does not convince this Court that these DOJ findings apply to the case before this Court.").

The only other piece of evidence related to the City's policies or customs that D'Amato cites is a list of cases provided by D'Amato in discovery in which complaints were filed against the City based on the City's unconstitutional customs, practices, and policies. (Doc. No. 41 at 15.) Again, D'Amato does not attach any documents related to these cases, point to any of their specific findings, or explain why they are relevant to D'Amato's claim. Courts are "not required to speculate on which portion of the record the non-moving party relies, nor is there an obligation to 'wade through' the record for specific facts." *United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993) (quoting *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989)). In addition, D'Amato does not even allege that any of these cases actually resulted in a judgment against the City.

Accordingly, the Court finds that D'Amato has failed to point to any competent evidence that would establish a genuine issue of material fact with respect to his claim against the City, and summary judgment is appropriate for this additional reason.

### c. State Law Claims

The remainder of D'Amato's claims arise under Ohio law, and diversity is lacking in this case. Pursuant to 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over state law claims once they have dismissed all claims over which they had original jurisdiction. "In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience,

fairness, and comity.'" *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). However, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996). Having disposed of D'Amato's federal claims and considering the relevant factors, the Court declines to exercise supplemental jurisdiction over the remaining state law claims and dismisses them without prejudice. *See Shaver v. Brimfield Twp.*, 628 F. App'x 378, 384 (6th Cir. 2015) ("[B]ecause the district court properly dismissed the Estate's federal claims, it did not abuse its discretion when it declined to exercise jurisdiction over the Estate's state law claims.").

## IV. Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 35) is GRANTED as to D'Amato's first and fifth causes of action brought under 42 U.S.C. § 1983. The remaining state law claims are DISMISSED WITHOUT PREJUDICE.

**IT IS SO ORDERED.**

    *s/Pamela A. Barker*
PAMELA A. BARKER
Date: March 20, 2020    U. S. DISTRICT JUDGE